**IN THE UNITED STATES DISTRTICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **H.S. FIELD SERVICES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-CV-531-GKF-PJC** |
| | ) | |
| **CEP MID-CONTINENT, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court is Defendant CEP Mid-Continent LLC's ("CEP") Application for

Attorney Fees and Other Expenses Pursuant to Rule 37(a)(5)(A) of the Federal Rules of

Civil Procedure. [Dkt. No. 116]. CEP seeks an award of $96,813.50 for attorney fees

and $8,099.69 for expenses incurred in filing and pursuing its Motions to Compel certain

documents from Plaintiff H.S. Field Services, Inc. ("HS"). The total amount requested is

$104,913.19.

## I
## BACKGROUND

CEP operates oil and gas leases in Osage County, Oklahoma, among other

places. Pursuant to a Master Service Agreement ("MSA"), HS provides various work

and services for CEP's oil and gas leases. This lawsuit arises out of the on-going

business relationship between HS and CEP between May 2003 to February 2012.

When disputes arose over HS's billings and CEP's payments, CEP, pursuant to the

MSA, sought to perform an audit of HS's records for 2010-12. CEP withheld payments

of approximately $525,000 pending completion of the audit, but then placed $600,000 in

escrow while the audit proceeded. HS alleges that CEP failed to pay for services

1

rendered under their contract, while CEP contends that HS overcharged it for contractual services. At the time the lawsuit was filed in July 2012, HS contended its damages were slightly more than $500,000, while CEP subsequently claimed damages in excess of $1.5 million. [Dkt. No. 43].

There are two paths to document discovery in this matter. First, under the terms of the MSA, HS is required to maintain "a true and correct set of records pertaining to the Work [HS performed]," and each subcontractor is to retain "all records which are subject to inspection hereunder for the applicable statute of limitations period." MSA at ¶6. This permits CEP to audit any and all records of HS relating to HS's invoices:

> Company [CEP] shall have to the right to audit Contractor's [HS's] books and records relating to all invoices issued pursuant to this Contract. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records available to Company at any time or times within such two-year period.

*Id.* at ¶12.

Once litigation began, CEP had a second path to HS documents – Fed.R.Civ.P. 26. On this path, CEP is entitled to discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." Fed.R.Civ.P. 26(b)(1). Furthermore, "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* Once litigation began, these paths intersected, or, perhaps, became identical, as CEP sought documents regarding HS's charges and

supporting CEP's claim of overcharges. For purposes of this Rule 37 attorney fee request, however, CEP's pursuit of audit documents *before this lawsuit was filed*, is not relevant, since it occurred outside the umbrella of Rule 26.

**II**
**HISTORY OF THE DISPUTE**

By mid-2011, problems arose between the parties and CEP refused to pay certain invoices submitted by HS. Shortly thereafter, CEP asserted its right under the MSA to audit HS's books regarding invoices.[1] In July 2012, HS filed suit in Washington County, Oklahoma, District Court; and thereafter, CEP removed the case to this Court. [Dkt. No. 2]. CEP filed its counterclaim in October 2012. [Dkt. No. 15].

In furtherance of the audit, CEP requested a broad range of documents from HS. Disputes quickly arose over what information HS maintained and what documents HS would make available to CEP. Once the dispute moved to court, CEP served its first discovery requests in December 2012. [Dkt. Nos. 31-18 & 31-19]. Again, disputes arose over the breadth of CEP's document requests, and the relevance of the information CEP sought. Accordingly, in May 2013, CEP filed a Motion to Compel. [Dkt. No. 31]. After its initial examination of the motion and response, the Court ordered the Parties to review its opinion in *Howard v. Segway*, 2013 WL 869955 (N.D.Okla. March 7, 2013), then meet and confer over the scope of information requested, and attempt to narrow their dispute. [Dkt. No. 44]. The Parties seemed to have successfully resolved most of their disputes; therefore, the Court denied the Motion to Compel

---

[1] HS initially refused to provide certain documents for the audit on grounds of confidentiality and privilege. In March 2012, the parties entered into an Escrow Agreement under which CEP placed $600,000 in an escrow account at Bank of Oklahoma, Tulsa, Oklahoma, in return for HS's cooperation in the audit. [Dkt. No. 31-9].

Without Prejudice in September 2013.  [Dkt. No. 46].  The Parties were directed to "advise the Court well before the scheduled discovery cutoff" if any matters were not fully resolved.  [*Id.*].

Four months later, in January 2014, CEP filed its Renewed Motion to Compel and for Sanctions.  [Dkt. Nos. 53 & 61].  It  soon became clear that a major cause of discovery disputes was whether HS had identified documents responsive to CEP's requests.  At a hearing in March 2014, it was unclear to the Court whether HS had properly identified the universe of responsive documents, whether certain documents requested by CEP had ever existed and whether documents had been destroyed or discarded.

> THE COURT:          And have you specifically looked to see whether there are roustabout worksheets for 2008 to 2012?
>
> MR. AKERS:          Your Honor, I will make another check to go completely through that because I don't want to represent to them.  If there's any other places that the business records are kept, I will have them go to those particular areas and I will get a precise statement to this court.

[Dkt. No. 75, p.64, lines 9-15].

As a result of HS's counsel's uncertainty, the Court directed him to review his client's discovery practices and certify that a reasonably thorough search had been made for requested documents.  Counsel was expressly directed that his signature would constitute certification "that he has made a reasonable effort to ensure that the client has provided all the information and documents available to him" responsive to CEP's discovery requests.  [Dkt. No. 72].  On April 1, 2014, counsel filed Plaintiff's Notice of Compliance with Discovery and with the Court's orders.  [Dkt. No. 78].  HS also produced to CEP a box of some 500 pages of time records, responsive to CEP's

document requests, which had not been produced before and which HS had previously indicated did not exist.[2]  [Dkt. No. 88, at 30].

On May 16, 2014, the Court entered an Order which stated, in pertinent part:

> It is clear that documents responsive to CEP's audit and Rule 26 requests were not initially produced by HS. It is also clear that HS repeatedly stated that all responsive documents had been produced, when, in fact, that representation was false. Finally, it is clear that a significant number of responsive documents have been located and produced only because CEP successfully prosecuted its Motion to Compel. Pursuant to Fed.R.Civ.P. 37(a)(5), the Court finds that CEP is entitled to an award of fees and costs associated with its Motion to Compel. **CEP shall file its request for fees and costs by July 1, 2014, and HS shall respond by July 15, 2014.**

CEP timely filed its request for fees and costs and on December 3, 2014, the Court conducted an evidentiary hearing on CEP's attorney fees and expenses.  CEP had previously submitted the Affidavit of attorney Heather Cupp, and the applicable law firm time records.  At the hearing, CEP offered the testimony of expert witness Thomas M. Ladner, an attorney with more than 30 years' experience in commercial litigation in the Tulsa area.  HS offered no evidence at the hearing.  In its briefing on the attorney fee issue, HS did not challenge the reasonableness of the hourly rates charged by the attorneys for CEP; nor did HS challenge any particular time entry or entries in the proffered time records.

### III
### APPLICABLE LEGAL PRINCIPLES

With respect to a Motion to Compel discovery, Fed. R. Civ. P. 37 provides:

---

[2]     Nearly two years earlier, HS had told CEP:  "CEP's understanding about our payroll records is correct.  There are no other reports available.  We have made all records kept by HS Field Services, Inc. available to auditor."  [Dkt. No. 53-6 (emphasis added)].

If the motion is granted--or if the disclosure or requested discovery is provided after the motion was filed--the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:

**(i)** the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

**(ii)** the opposing party's nondisclosure, response, or objection was substantially justified; or

**(iii)** other circumstances make an award of expenses unjust.

Although Rule 37 indicates that the attorneys' fees and expenses that may be awarded are those incurred in either making or opposing the motion to compel, Fed.R.Civ.P. 37(a)(5), the Rule should not be so narrowly read. "The sanctions enumerated in the rule are not exclusive and arbitrary but flexible, selective, and plural. The district court may, within reason, use as many and as varied sanctions as are necessary to hold the scales of justice even." 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2284 (3d ed. 2010). "The protections and sanctions found in the discovery rules are not absolute and contemplate the use of judicial discretion." *Marshall v. Ford Motor Co.*, 446 F.2d 712, 713 (10th Cir. 1971). *See also*, *Brown v. McCormick*, 608 F.2d 410, 414 (10th Cir. 1979); *Lamer v. Williams Communications, LLC*, 2007 WL 1461658, *2 (N.D.Okla. May 16, 2007); *Batt v. Kimberly-Clark Corp.*, 438 F.Supp.2d 1315, 1316 (N.D.Okla. July 14, 2006). Any sanctions must be just and reasonable. *Lamer*, 2007 WL 1461658, *2.

"Rule 37 sanctions must be applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction, and to deter those who might be

tempted to such conduct in the absence of such a deterrent." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763–64 (1980) (internal quotation marks and brackets omitted). In the Tenth Circuit, there are various criteria a trial court should consider when determining whether Rule 37 sanctions are warranted. "These criteria include: '(1) the degree of actual prejudice ...; (2) the amount of interference with the judicial process; ... (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.'" *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir.1994) (*quoting Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir.1992)). "The *Ehrenhaus* factors are simply a non-exclusive list of sometimes-helpful "criteria" or guide posts the district court may wish to "consider" in the exercise of what must always remain a discretionary function." *Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1323 (10th Cir.2011); *Porter Bridge Loan Co., v. Hentges*, 2012 WL 7853856, *5 (N.D.Okla. Oct. 25, 2012).

Courts should impose the least harsh sanction that is appropriate. In determining an appropriate sanction for discovery misconduct, the mildest sanction is "an order to reimburse the opposing party for expenses caused by the failure to cooperate." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Development & Trade Svcs., Inc.*, 2005 WL 1958361, *10 (S.D.N.Y. Aug. 16, 2005). Courts have broad discretion to determine an appropriate fee award based on the circumstances presented in a particular case. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). A court's determination of an appropriate fee award will be set aside only for abuse of discretion. *Lancaster v. Indep. School Dist. No. 5*, 149 F.3d 1228, 1236 (10th Cir. 1998); *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1313 (2d Cir. 1993).

When assessing the reasonableness of a request for attorney fees and expenses, courts apply a "lodestar" approach, multiplying the number of hours reasonably expended by a reasonable hourly rate. *Collinge v. IntelliQuick Delivery, Inc.*, 2014 WL 2569157, *1 (D.Ariz. June 9, 2014) (*citing Stokes v. Microsemi Corp.*, 2003 WL 22114276, *2 (D.Ariz. Sept. 10, 2003)).

In connection with a motion to compel, a party is presumptively entitled to an award of attorney fees and expenses in two instances: (1) where the court grants the motion to compel, or (2) where the responding party produces responsive documents after the motion is filed. Fed.R.Civ.P. 37(a)(5)(A); Gensler at 785. "[B]elated compliance [with one's discovery obligations] does not insulate a party from sanctions." *Underdog Trucking, L.L.C. v. Verizon Svcs. Corp.*, 273 F.R.D. 372, 379 (S.D.N.Y. 2011).

## IV
## HS's DISCOVERY CONDUCT

### A. HS's Inconsistent Statements Regarding Its Documents

Discovery has been an ongoing battle in this case. HS has often indicated that all relevant documents had been produced, only to be proven wrong. Below are a few examples of HS's inconsistent statements.

In February 2012, before this lawsuit was filed, Jim Shambles, head of HS, responded to an auditor's request for documents:

> HS Field Services, Inc. does not want to hear any more about background information or lack thereof. We have never ripped up and thrown away any field tickets…. Nothing of relevance has ever been thrown away. [Dkt. No. 31-8 (emphasis added)].

Later, however, Shambles testified that driver logs were discarded after six months.

Q:    Have you destroyed any driver logs since this audit began?

A:    <u>I wouldn't say destroyed. I'd say from the time in the first of November, once that six months is up, we no longer have them</u>.

[Dkt. No. 53-13, p. 126, lines 20-24 (emphasis added)].

Later, Shambles testified:

Q:    From the beginning of the audit, do you believe that you threw away or destroyed these driver logs?

A:    I believe so, yes.

[*Id.*, p. 127, lines 8-10].

Similarly, in July 2012, HS's counsel advised that "We have made all [payroll] records kept by HS Field Services, Inc. available to auditor." [Dkt. No. 53-6]. Yet in April 2014, HS's counsel found in excess of 500 pages of payroll records that had not been produced to CEP.

## B. HS's Failure to Identify and Collect Responsive Documents

Although HS's counsel indicated on April 1, 2014, that HS had made a thorough search for responsive documents, testimony from HS employees indicated otherwise. Between March 27 and May 8, 2014, CEP took deposition of various HS employees with knowledge of HS's records.

### (1) March 27, 2014 – Deposition of Bo Benfer.

Although HS said roustabout worksheets were not routinely kept, Benfer testified that Roustabout Worksheets were required by HS and maintained daily. [Dkt. No. 100-9, p. 27, lines 3-21; p. 39, line 2 – p. 40, line 8].

**(2) April 21, 2014 – Deposition of Jamie Laws.**

Laws testified that no one at HS ever asked her to look for payroll records

responsive to CEP's document requests. [Dep. Of Jamie Laws, Dkt. No. 100-8, p. 44,

lines 6-10].

**(3) April 18, 2014 – Deposition of Garry Hagy.**

Hagy testified that no one asked him to look for documents responsive to

CEP's discovery requests. [Dep. of Garry Hagy, Dkt. No. 100-10, p. 31, lines 8-

12].

**(4) April 18, 2014 – Deposition of Edward Hawn.**

Hawn testified that log books and time sheets were required to be kept,

that log books were discarded after six months, and that no one had ever asked

whether certain documents existed at HS.

> Q:      Can you just briefly describe for me what paperwork HS is required
> to maintain in order to show compliance with DOT regulations?
> A:      Log books.  Time sheets.  Log books. And maintenance records on
> our vehicles.
> Q:      What is a log book?  Can you describe that for me?
> A:      It logs the driver's time of hours driving and when working.
> Q:      Does the log book, is the log book kept in the truck with the driver?
> A:      Yes.
> Q:      And are those log books, do you know how long those log books
> are maintained?
> A:      Six months.

[Dep. of Edward Hawn, Dkt. No. 100-13, p. 19, line 18 – p., 20, line 7].

> Q:      In connection with this lawsuit, did anyone at HS or HS's attorneys
> ever ask you about whether certain documents existed or didn't exist?
> A:      No.
> Q:      Did anybody ever ask you to search your records?
> A:      No. Jim asked me if I had any notebooks to be turned in in
> connection with this.  And I told him no, I didn't; I throwed all mine away.  I
> don't carry my notebook.  They're personal notebooks.  I can't carry them.
> I fill them out just for my own reference to what I've got going on that day.

When I finish that notebook, I discard it and start a new one; I don't hang on to them.

[*Id.*, p. 49, line 24 – p. 50, line 11].

### (5) May 8, 2014 – Deposition of Brittney Low.

Low testified that no one had ever asked her to locate daily times records

or any other documents.

> Q:     At any point in time have you been asked by anyone at HS to locate daily time records for HS employees?
> A:     No.
> Q:     Have you ever been asked by Mr. Akers to locate daily time records?
> A:     No.
> Q:     Have you ever been asked by Jamie Laws?
> A:     No.
> Q:     Ever asked by Jim Shambles?
> A:     No.

[Dep. Of Brittney Low, Dkt. No. 100-6, p. 45, lines 6-15]

> Q:     Do you recall in March of 2014, just recently, did Mr. Akers come to HS offices and line everybody up and ask where any documents are located?
> A:     He came in and he looked for himself.
> Q:     Tell me about that.
> A:     He came in and he looked in our office and he looked out in the Conex.  I wasn't with him.
> Q:     Do you know if he looked up in the attic?
> A:     I don't know.  I was at my desk.
> Q:     Did he ask anybody where documents were maintained?
> A:     No.  He just looked.  I mean, he looked.
> Q:     So he didn't ask specifically where daily time records were located?
> A:     No.
> Q:     He didn't ask specifically where any roustabout worksheets were located?
> A:     No.
> Q:     He didn't ask if any documents had been destroyed?
> A:     No.

[*Id.*, p. 59, line 19 – p, 60, line 14].

> Q:     Have you been asked by anybody to locate driver daily logs?

A:     I mean, not other than what I have.
Q:     But for the litigation?
A:     Oh.  No.
Q:     How about work tickets?
A:     No.
Q:     Driver time sheets?
A:     No.

[*Id.*, p. 62, lines 14-22].

On April 1, 2014, Counsel for HS produced to CEP a box of 500 documents responsive to CEP's discovery requests found in the attic of his client's office. [Dkt. No. 116-9, p. 30, line 13-18; p. 38, line 18 – p. 39, line 7].

## V
## DISCUSSION

As the Tenth Circuit Court of Appeals has noted:

> Discovery is not supposed to be a shell game, where the hidden ball is moved round and round and only revealed after so many false guesses are made and so much money is squandered.

*Lee v. Max Intern, LLC*, 638 F.3d 1318, 1322 (10th Cir. 2011).

District courts enjoy "very broad discretion to use sanctions where necessary to insure ... that lawyers and parties ... fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial." *Id.* at 1320 (*quoting In re Baker*, 744 F.2d 1438, 1440 (10th Cir.1984) (*en banc*)).

CEP's discovery requests were served in December 2012.  A year later, after the parties met and conferred and narrowed certain areas of dispute, the documents at issue were more clearly identified; however, when production was not forthcoming, CEP filed its Renewed Motion to Compel on January 16, 2014.  [Dkt. No. 53].  The documents sought included: roustabout worksheets, employee time sheets, equipment

tickets, driver/water hauler tickets, driver logs, daily logs, and financial information including electronic billing records, and third-party invoices. [*Id.*].

Subsequently, it became apparent that the Plaintiff had not fulfilled its responsibility to identify and marshal the documents responsive to CEP's requests, as, for example, when the Court specifically asked Plaintiff's counsel if he or his client had checked to see whether they had roustabout worksheets for the years 2008-2012. Counsel seemed uncertain. He stated he would "make another check." [Dkt. No. 75, p. 64, lines 11-15]. This statement came 15 months after CEP first served its discovery requests and two months after CEP's Renewed Motion to Compel.

Clearly, a major problem with this case has been Plaintiff's inability or unwillingness to fulfill basic responsibilities related to discovery. In responding to discovery requests, "the attorney overseeing document production must inform himself or herself as to what documents are responsive to the discovery requests and which of these, if any, will be produced." *Howard,* 2013 WL 869955, *4. The responding party must develop a "reasonably comprehensive search strategy" to find responsive documents. *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006). *See Moore v. Chertoff*, 255 F.R.D. 10, 21-27 (D.D.C. 2008) (imposing sanctions for party's failure to conduct a reasonable search for responsive documents). That was not done here. The record evidence reflects that office personnel at HS were not asked to locate documents responsive to CEP's discovery requests, that documents such as driver log books were discarded by HS, and that inconsistent testimony was offered regarding whether certain documents existed. Additionally, even a year after this discovery dispute arose, counsel for HS was unable to state clearly on the record that a reasonably thorough search had

been made for all documents responsive to CEP's requests. After assurances that all documents had been produced, without explanation, a box of documents was suddenly found in HS's attic.

The Court has recited the history set forth above to emphasize that CEP incurred significant fees and expenses pursuing documents that should have been produced long before. The costs incurred by CEP are not confined to the preparation of a Motion to Compel, but include months of effort pursuing documents that HS had assured CEP either did not exist or that it had already provided. The additional 500 documents produced in April 2014, would not have been produced but for CEP's extraordinary efforts in this regard.

The Court has considered the factors outlined in *Ehrenhaus*, 965 F.2d at 921. HS's discovery performance has prejudiced CEP by impeding the audit which CEP is entitled to perform, and preventing CEP from conducting discovery necessary to defend against HS's claims and to prosecute its own counterclaims. This has required the Court's intervention on numerous occasions, and needlessly increased the cost of this litigation. The record evidence reflects HS's culpability in failing to fulfill its basic discovery obligations in identifying and marshaling the documents responsive to CEP's requests. *Howard*, 2013 WL 869955, *4; *Trappel*, 233 F.R.D. at 374.

### A. CEP's Attorney Fee Request

CEP's total request for fees and expenses is $104,913.19. This includes attorney and paralegal time, expenses and expert fees incurred for the hearing before the Court on December 3, 2014.

Plaintiff's responses to the Motion for Attorney Fees does not challenge the hourly rates claimed by CEP, not does it challenge any specific time entry in the submitted records.  Plaintiff's response contends:

1.  That Plaintiff's request for a protective order [Dkt. No. 81] was granted before the production of documents.  The motion sought to quash and for protective order as to four depositions noticed by CEP.  Contrary to HS's statement, this motion was not granted.  It was found to be moot.  [Dkt. No. 86].

2.  Plaintiff recites that "as early as March 12, 2014" it made a diligent search for documents responsive to HS's discovery requests.  [Dkt. No. 140, p. 4].  The problem with this is that CEP served its discovery requests on December 18, 2012, and renewed its Motion to Compel on January 16, 2014. It is hardly a defense for HS to say it finally made a thorough search of its records 15 months after the discovery requests were first served, and nearly 60 days after the Renewed Motion to Compel was filed.

3.  Plaintiff states that the search for additional documents was completed before the depositions of HS employees regarding documents.  Whatever search ultimately located the documents that HS found in the attic, it is still relevant to this motion that HS employees familiar with the company's records and their location were never asked to locate documents responsive to CEP's discovery requests.  The circumstances surrounding the discovery of the box of documents in

HS's attic remains somewhat mysterious.  The Court quizzed HS's

counsel how it happened that after his client had reported for months

that all documents had been produced or didn't exist, that suddenly a

box of documents is found.

> MR. AKERS: I found them, just to be flat honest with you, Your
> Honor.
>
> THE COURT:        Well, where were they?
>
> MR. AKERS: They were up on the attic side of where prior to them
> having a – I assume that's what it was – they were in an attic in the
> warehouse…. I didn't go into great detail.  There's a lot of turnover
> up there.  Jamie Laws doesn't work for H&S anymore.  There's a lot
> of turnover in the office area.  I found those documents with a
> couple of the other employees of H&S Field Service at that time.
> We produced them.  I did exactly what the court asked me to do….

[Dkt. No. 116-9, p. 30, lines 13-25].

Akers' answer begs the question of why Jamie Laws and other HS employees

were not asked about documents long before April 2014.  Had that happened, perhaps

these documents would have been located without the huge expenditure of time and

money that ultimately resulted.

### (1) Counsel's Hourly Rates

Plaintiff has not challenged the hourly rates claimed by Defense counsel.

Nevertheless, the Court has examined these rates to determine if they comport with the

prevailing market rate in the community.  *Malloy v. Monahan*, 73 F.3d 1012, 1018 (10th

Cir. 1996).  The blended rate[3] is $270.  This Court has routinely approved hourly rates

---

[3]     To determine the blended or average hourly rate the Court has divided the
amount of the fee request as it pertains only to attorney work ($89,307) and divided that
sum by the total number of hours claimed by the attorneys who worked on the matter
(331).  The result is a blended rate of $270.

of $250. *Wormuth v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 2166358 (N.D.Okla. May 21, 2008); *D.H. v. Ponca City Independent School Dist. No. 71*, 2007 WL 267 07105, *2-3 (N.D.Okla. Sept. 7, 2007); *Oklahoma Natural Gas Co. v. Apache Corp.*, 355 F.Supp.2d 1246, 1255 (N.D.Okla. 2004). This rate is consistent with rates approved by our sister courts. *See*, *Bosh v. Cherokee County Government Bldg*, 2015 WL 51287, *3 (E.D.Okla. Jan. 2, 2015); *Chatman v. Buller*, 2013 WL 5729603 (E.D.Okla. Oct. 22, 2013); *Lamb v. Scotts Miracle-Gro Co.*, 2008 WL 731234, *1 (E.D.Okla. March 17, 2008).

Accordingly, the Court will reduce the blended rate to $250 per hour to more closely reflect the prevailing market rate in this community.

### (2) Hours Expended

CEP claims a total of 331 hours of attorney time and 46.85 hours of paralegal time associated with its motion. CEP's total fee/expense request of $104,913.19 is broken into five categories, and was then supplemented following the fee hearing in December 2014. The categories are:

- **A-1 is time spent "complying with order re First Motion to Compel."** This totals 24.15 attorney hours and 16.3 paralegal hours totaling $9,867 in fees.

- **A-2 is time spent preparing for and attending the hearing on CEP's Renewed Motion to Compel and for Sanctions.** This totals 145.6 attorney hours and 19.65 paralegal hours representing $41,846.50.

- **A-3 is time spent after the Renewed Motion to Compel obtaining compliance, as well as time spent on its Motion for Contempt.** This totals 77.85 attorney hours and 9.9 paralegal hours representing $25,493.

- **A-4 is time spent preparing the Motion for Attorney Fees.** This totals 54.5 hours representing $11,708.

- **A-5 totals $4,998.32 in expenses associated with the motion**.

   **CEP's Supplement to its fee application** totals an additional 28.45 attorney hours and .2 paralegal time representing $7,899, plus additional expenses of $5,074.72 (including expert fees and expenses of Thomas Ladner, totaling $3,024.97).

   The Court will address these categories below.

   Category A-1 reflects time spent complying with the Court's Order regarding the First Motion to Compel. The First Motion to Compel was filed in May 2013 [Dkt. No. 31]. On July 16, 2013, the Court entered an Order which found that many of CEP's discovery requests were overly-broad. The parties were directed to review this Court's opinion in *Howard*, 2013 WL 869955, to meet and confer and focus the discovery on "essential discovery documents." [Dkt. No. 44]. Subsequently, the Court denied the First Motion to Compel without prejudice, after it appeared the parties had resolved most of their discovery disputes. [Dkt. No. 46]. Accordingly, the Court finds that the time claimed in Category A-1 is not compensable within the context of this fee award. [Dkt. No. 53]. This results in a reduction of 24.15 attorney hours and 16.3 paralegal hours.

Category A-2 reflects time preparing for and attending the hearing on CEP's Renewed Motion to Compel and for Sanctions. The Court reduces the amount claimed by 37.3 attorney hours and 1.5 paralegal hours. Most of this time was time expended by Briana J. Clifton on matters that are not compensable within the context of this fee award. Most of Clifton's time was spent researching the issue of spoliation of evidence and the sanction of an adverse inference. The Court has made no finding of spoliation and made no recommendation of an adverse inference. Thus, this time is disallowed. On similar grounds, other reductions include 5.5 hours from time claimed by Heather Cupp, 1.5 hours from paralegal Linda West and 4.5 hours from Kevin Hayes.

The total reduction is 37.3 in attorney hours and 1.5 paralegal hours.

Category A-3 is time spent after the Renewed Motion to Compel obtaining compliance, as well as time spent on CEP's Motion for Contempt.[4] The Court has made reductions in this category based on hours spent on CEP's Motion for Contempt that are not compensable within the framework of this fee award. This results in a reduction of 24.8 attorney hours and 2.15 paralegal hours in Category A-3.

Category A-4 is time spent preparing the Motion for Attorney Fees. The Court has reviewed these records and finds that no reduction is required.

Category A-5 consists of expenses associated with the motion to compel. The Court has reviewed these expenses and finds that no reduction should be made.

CEP's fee/expense Supplement includes expert fees of $3,000 for Thomas Ladner who testified at the hearing on December 3, 2014, and additional fees incurred

---

[4]     CEP has filed three Motions for Contempt herein. Dkt. Nos. 76, 101, 180. Two of these motions have been denied. [Dkt. Nos. 188 & 193].

in relation to that hearing.  The Court has reviewed this supplemental request and finds that no reduction is required.

The Court also finds that there are numerous instances of "block billing" in the fee application.  The Court will impose a 10 percent reduction or $9,681.00 to account for this problem.

### B. THE COURT'S COMPUTATION

The total reduction is 86.25 attorney hours and 18.45 paralegal hours.  Total allowable attorney hours are 244.75.  Total allowable paralegal hours are reduced by 18.45 hours.  With these reductions, the allowed fee/expense amount is:

Attorney fees:  244.75 hours at $250 = $61,187.50

Paralegal fees:  26.3 hours at $160 + 2.1 hours at $165 = $4,554.50

**Sub-Total – Fees:  $65,742**

This amount will be reduced an additional 10 percent due to block-billing in time entries.  Many time entries lumped together time performed on various tasks; thus, in these instances, making it impossible to distinguish permissible time from non-permissible time.  A percentage reduction is the most efficient method to deal with this problem.  *See*, *Oklahoma Natural Gas Co.*, 355 F.Supp.2d at 1264-65 and cases cited therein.

**TOTAL ALLOWED ATTORNEY AND PARALEGAL FEES: $59,167.80**

**EXPENSES: $4,998.32 + $5,074.72 (supplement) = $10,073.04**

**TOTAL APPROVED AMOUNT: $69,240.84**.

CEP's attorney fee request is approved in the amount $69,240.84 as against Plaintiff H.S. Field Services, Inc., to be paid within 60 days of the date herein.

**IT IS SO ORDERED** this 29th day of April 2015.

Paul J. Cleary
United States Magistrate Judge